**Linda K. PIKE, as personal representative of the Estate of Billy J. Pike, deceased, Plaintiff,**

v.

**KENTUCKY POWER COMPANY, Defendant.**

**Civ. A. No. 92–48.**

United States District Court, E.D. Kentucky.

Dec. 3, 1993.

---

Gary E. Becker, Louisville, KY, Allan G. Loosemore, Jr., Shaw & Loosemore, P.C., Evansville, IN, for plaintiff.

Albert M. Orgain IV, Sands, Anderson, Marks & Miller, Richmond, VA, Randall Scott May, Barrett, Haynes, May, Carter & Roark, P.C., Hazard, KY, for defendant.

## MEMORANDUM OPINION AND ORDER

WILHOIT, District Judge.

This matter is before the court upon the plaintiff's motion for partial summary judgment, (Record # 23), and cross motions by the defendant for summary judgment (Record # 25 and # 29). The parties have fully and extensively briefed this matter and have presented oral arguments to the Court. Consequently, the matter is now ripe for determination.

### I. Background

On the morning of February 24, 1991, at approximately 10:40 a.m., Billy J. Pike was the pilot and sole passenger of a Cessna airplane; tragically, the plane collided with Kentucky Power Company's non-energized static power lines crossing Highway 15 near Bonnyman, Perry County, Kentucky. The plane crashed nearby, and Billy J. Pike was fatally injured.

Kentucky Power Company initially erected the power lines in 1939 and they underwent subsequent alteration or reconstruction in 1965. The terrain in this part of the state is best characterized as mountainous. In fact, in order to construct Highway 15, it was necessary to make a V-shaped cut into the mountain. The transmission lines were approximately 203 feet above the surface of Highway 15 and the static lines stood approximately 233 feet above the surface. The lines had no obstruction markers.

Billy J. Pike and his wife were citizens of Indiana, and had come to Eastern Kentucky to visit relatives. Trooper Darrell Tolson of the Kentucky State Police was the investigating officer at the scene of the plane crash. He estimated that over 1,000 people were present at the Bonnyman Flea Market on the day of the accident as cars were lining both sides of Highway 15 for quite a distance.

Mr. Tolson took the statement of the plaintiff, Linda K. Pike, on the day of the accident. During this statement, the plaintiff stated that she had been visiting her family at Boone Ledge for one week prior to the crash; that her husband had said he would fly to Eastern Kentucky on the date of the accident; and that he would fly over the relatives' house and over the flea market to signal for his family to pick him up at the Eastern Kentucky Regional Airport. The plaintiff used the term "buzz" meaning a low pass to draw attention. (Philip Dawes deposition, p. 30–33).

Kathy Trout, the plaintiff's daughter, testified that her mother had made that statement and that the decedent was in fact flying over the flea market to signal the family to pick him up at the airport. (Trout deposition, p. 15–16) During oral arguments, plaintiff's counsel expressed his belief that plaintiff had made these statements in a condition of shock and that on this particular occasion there was no reason for her to believe he would fly at a lower elevation to signal his arrival; this was a surprise. However, plaintiff's counsel did concede that Ms. Pike had drawn her initial conclusion based upon past experiences where the decedent had in fact "buzzed" the locale where his wife was present to signal for her to pick him up at a nearby airport.

The plaintiff brings this action for wrongful death on behalf of his estate under a negligence theory. She alleges that Kentucky Power was negligent in failing to install obstruction markers on the power lines. She does not assert any particular reason why her husband was flying at such a low altitude; she merely theorizes that he had engine trouble. However, she has never pointed to any supporting evidence in the record for such a theory. Defendants, on the other hand, claim that the decedent was operating his plane at an unreasonably low altitude in violation of state and federal regulations, that this was negligence on his part, and finally, that Kentucky Power was under no legal duty to install such obstruction markers.

The plaintiff filed a motion for partial summary judgment claiming that the alleged violations of administrative regulations by Kentucky Power Company constituted negligence per se. Defendants filed cross motions for summary judgment alleging negligence per se by the decedent and alternatively that the defendant had not breached any legal duty by failing to install obstruction markers on the power lines. The court is persuaded by the arguments expressed by the defendant and determines that Kentucky Power was under no legal duty to install obstruction markers.

## II. Kentucky Airport Zoning Commission Regulations

The resolution of the legal issues in this matter turn upon the interpretations of several Kentucky statutes and the administrative regulations promulgated by the regulatory body known as the Kentucky Airport Zoning Commission. In order to ensure a proper application of law, it is important to consider the legislative history of these statutes and regulations.

In 1939, when the power lines in question were originally constructed, there was no applicable regulation or statute that dealt with aviation, marking of potentially obstructing edifices or the zoning of airspace. Consequently, Kentucky Power constructed and altered the power lines in accordance with all applicable laws and regulations. However, in 1942, the legislature, passed Chapter 183 of the Kentucky Revised Statutes establishing the Kentucky Aeronautics Commission. In the following years, Chapter 183 was amended to allow the creation of local airport boards to handle eminent domain proceedings, yet there was still no mention of zoning or the marking of obstructions.

Airport zoning authority was first granted in 1946 when Chapter 183 was again amended to allow local political subdivisions to adopt airport zoning regulations. However, the legislature was particularly mindful to always communicate its continued commitment to prospective application of its regulations. *See* KRS § 183.752(5) (repealed 1960). Finally, in 1960, the Kentucky legislature repealed these statutes allowing localities to mandate airport zoning in favor of creating a state-wide agency to handle such issues. This agency is known as the Kentucky Airport Zoning Commission (hereinafter "KAZC"). The agency was created to assume zoning jurisdiction over all land use around publicly owned airports and to exercise all the powers and duties given to them to ensure the proper and safe use of navigable airspace within the state. *See* KRS § 183.861–865.

Since its creation, KAZC has promulgated numerous regulations. Their first attempt at regulating marking requirements did not occur until 1972, when KAV–17, the predeces-

sor of 602 Ky. Admin. Regs. 50:100 (1975), was passed. The parties agree that KAV–17 excluded pre-existing structures; it is the creation of § 50:100 that generates this dispute.

In 1975, the KAZC adopted 602 Ky. Admin. Regs. 50:100 which prospectively required anyone who was issued a permit to alter or construct a structure to comply with all applicable marking and lighting regulations. The plaintiff conceded that the 1975 version did not apply to pre-existing structures either. In 1979, the KAZC again amended this regulation to include a provision that stated "Every person who was issued a permit to alter or construct a structure, or *who maintains an obstruction*, ... is required to mark and light this structure ..." 602 Ky. Admin. Regs. 50:100 (1979). Plaintiff claims that this expanded the statute to include all pre-existing structures, and it is upon this provision that she hangs her hat. Plaintiff feels that the amendment above expressed an intention on the part of the KAZC to mandate retroactive application of all their regulations despite years of repeated illustrations of a contrary aim.

Plaintiff is misguided on this point, however, because the 1979 version of this regulation was not applicable at the time to this 1991 incident. In 1984, the KAZC amended the regulation and deleted the amendment discussed above. Moreover, the KAZC also edited the regulations to include a specific grandfather provision. *See* 602 Ky. Admin. Regs. 50:60. Section 4 provides:

> Power lines existing prior to the date of this regulation for which no permit has issued may continue in their present configuration so long as such lines are not subsequently determined to be a hazard to air navigation by the Kentucky Airport Zoning Commission. However, any person proposing to alter or reconstruct any wire, transmission, distribution or other power line subsequent to September 1, 1983, that exceeds 200 feet above the ground shall be required to obtain all necessary permits from the Commission and comply with all markings and lighting requirements in accordance with the rules and regulations of the Commission.

*Id.* This was a clear message from the KAZC. Existing structures could continue in their present condition unless the agency specifically found the structure to be a hazard thereby creating the need for marking and lighting. The plaintiff has provided no evidence of such a finding by the KAZC that defendant's power lines were indeed hazardous to navigable airspace.

The court is not persuaded that the 1979 language survived the 1984 amendments. The addition of the grandfather clause clearly demonstrates an intent to ensure that the regulations are not applied retroactively. Both the current administrator of the KAZC Ron Bland, and the former administrator, Ed Martin, agree with this interpretation. These opinions cannot be ignored by this court as plaintiff's counsel urges. Since it is uncontroverted that the power lines in question predate the maker regulation, the grandfather clause is applicable as a matter of law, and Kentucky Power committed no violation, nor is negligent per se.

Finally, it should be noted that plaintiff's argument that this "grandfather" provision only applies to power lines in "zoned airspace" is completely meritless and is viewed by this court as a futile attempt to circumvent the obvious intent of the regulations. Plaintiff defines zoned airspace as the area within 20,000 feet of a public airport. The nearest airport in this case was over five miles away in Hazard, clearly not within zoned airspace.

Plaintiff argues that the general marker regulation applies to all power lines, whenever erected, that are in navigable airspace, and that the grandfather clause only exempts power lines proximate to airports. The subject power lines were in "navigable airspace," but too distant from the Hazard airport to be in zoned airspace. Thus, they are subject to the marker rule, but not the grandfather clause. Had the lines been much closer to an airport, they would have been in "zoned airspace," and exempt. Since defendant does not dispute that the power lines were over 200 feet tall, unmarked, and not proximate to the Hazard airport, plaintiff contends Kentucky Power was negligence per se. *Britton v. Wooten*, 817 S.W.2d 443, 447 (Ky.1991) (violations of state regulations is negligence per se).

First, the grandfather clause does apply. Nothing in the regulatory language suggests

that the grandfather clause is restricted to "zoned airspace." The defendant argues, and this court agrees, that regulations 50:100, requiring markers on power lines, and 50:060 which exempts preexisting structures can only be sensibly interpreted in tandem. There is no indication from the language of the regulations that each apply to different types of airspaces.

Secondly, this interpretation leads to the absurd conclusion that KAZC desired to exempt preexisting power lines *near* airports, where the dangers are greater, but require the addition of markers to *distant* power lines, representing much less risk. This reading defies common sense and cannot be the intention of the KAZC.

The plane crash and fatal accident of Billy J. Pike is a tragic incident. The court is extremely mindful of the loss suffered by the plaintiff in this action. Unfortunately, sympathy alone is not enough to defeat defendant's motion for judgment as a matter of law. Accordingly, the court having considered this matter and being otherwise sufficiently advised,

**IT IS THEREFORE ORDERED AND ADJUDGED:**

1) that plaintiff's motion for partial summary judgment (Record # 23) is hereby **OVERRULED;**

2) that defendant's motions for summary judgment (Record # 25 and # 29) are hereby **SUSTAINED;**

3) that plaintiff's motion to strike the defendant's motion for summary judgment (Record # 36) is **OVERRULED;**

4) that plaintiff's motion to strike exhibit C from the defendant's response to motion for partial summary judgment is **OVERRULED;**

5) the defendant's motion to exclude evidence at trial is **OVERRULED** as moot; and

6) the matter is **DISMISSED** with prejudice and **STRICKEN** from the docket.

This is a final and appealable order.